1

2

3

4

5

6

7

8

9

10                    UNITED STATES DISTRICT COURT

11                   EASTERN DISTRICT OF CALIFORNIA

12

13  JOSEPH L. JOHNSON; CYNTHIA A.      No.  2:13-cv-01072-JAM-KJN
    MITCHELL, individually and as
14  successor in interest to
    Mario Romero; N.R.,
15  individually and as successor     **ORDER GRANTING DEFENDANTS'**
    in interest to Mario Romero;      **MONELL MOTION FOR SUMMARY**
16  D.M., a minor; D.M., a minor;     **JUDGMENT**
    AHN KHE HARRIS; AHN LOC
17  HARRIS; CYNQUITA MARTIN,

18            Plaintiffs,

19       v.

20  CITY OF VALLEJO, a municipal
    entity; DUSTIN JOSEPH; SEAN
21  KENNEY; JOSEPH KREINS,
    individually and in his
22  official capacity as Chief of
    the Vallejo Police
23  Department,

24            Defendants.

25

26       This action arises from a police shooting incident that

27  occurred on September 2, 2012 in Vallejo, California that

28  resulted in the death of Mario Romero ("Decedent") and the injury

                              1

of Joseph Johnson ("Johnson").  Two complaints were filed
separately but later consolidated by this Court (Doc. #2, 19).
Defendants the City of Vallejo ("the City"); Joseph Kreins
("Kreins"), Chief of the Vallejo Police Department ("VPD") at the
time of the incident; and VPD Officers Dustin Joseph ("Joseph")
and Sean Kenney ("Kenney") (collectively "Defendants") filed five
separate motions for summary judgment (Doc. #63-67).  A hearing
on these motions was held on April 8, 2015.  This Order addresses
only the fifth motion for summary judgment (which the Court took
under submission) ("the Monell MSJ"), in which Defendants
specifically challenge the Plaintiffs' claims under Monell v.
Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691-95
(1978) ("Monell").

     At the hearing, Plaintiffs N.R., Ahn Khe Harris, Ahn Loc
Harris, and Cynquita Martin ("the Martin and Harris Plaintiffs")
all conceded that as a result of the Court's ruling on the other
motions, they no longer could pursue their Monell claims, as they
had no legal basis for doing so.  Therefore, this Order discusses
the Monell claims as stated in the complaint filed by Plaintiff
Cynthia Mitchell, individually and on Decedent's behalf, and
Johnson.


                 I.   FACTUAL AND PROCEDURAL BACKGROUND

     The following facts are undisputed.  Johnson's Response to
Defendants' Statement of Undisputed Facts (Doc. #77-1);
Mitchell's Response to Defendants' Statement of Undisputed Facts
(Doc. #81-1); Defendants' Response to Mitchell's Separate
Statement of Facts (Doc. #92-1); Defendants' Response to

1    Johnson's Separate Statement of Facts (Doc. #93-1); Martin &

2    Harris Plaintiffs' Response to Defendants' Statement of

3    Undisputed Facts (Doc. #80).

4        In the early morning of September 2, 2012, Kenney and Joseph

5    (collectively "the officers") were responding to a pending call

6    related to a reported burglary.  The officers spotted a white

7    Thunderbird occupied by Decedent and Johnson.  Kenney had

8    received a briefing sometime prior to this event of a vehicle

9    similar in description to the Thunderbird as being involved in a

10   drive-by shooting.  The officers pulled up to the Thunderbird,

11   stopping in the middle of the street facing the front of the

12   Thunderbird and within 5-15 feet of it.  The Martin and Harris

13   Plaintiffs resided in the house directly facing the scene of this

14   incident and were inside at the time of the shooting.

15       It is at this point, chronologically, that the versions of

16   events, and evidence in support thereof, are disputed.  What is

17   not disputed is that during the encounter between Decedent,

18   Johnson and the officers that followed at least 3 rounds were

19   fired into the Thunderbird's driver-side door and window and 23

20   rounds were fired into the Thunderbird's windshield by the

21   officers.  Johnson was injured as a result of the shooting.

22   Decedent died as a result, receiving bullet wounds in his arms,

23   wrist area and hands region among other areas.

24       Two very distinct and competing versions of events are

25   evident in the record starting from the time the officers pulled

26   up to the Thunderbird until the end of the incident.  One version

27   is that primarily put forth by the Defendants and the other a

28   version put forth by Plaintiffs.

                                    3

1      A.   Defendants' Version

2      Kenney stopped his vehicle approximately 10-15 feet away

3  from the Thunderbird, not obstructing its path.  Kenney Depo.

4  169:18-22. Upon the officers stopping their car, Decedent opened

5  the Thunderbird's driver-side door and started to run away.

6  Kenney Depo. 79:10-23. Joseph testified that he noticed Decedent

7  was holding his waistband and observed the butt of a gun tucked

8  into the waistband.  Joseph Depo. 104:17-25.   Decedent then

9  "spun around and went back towards his vehicle" with a handgun in

10  his right hand.  Joseph Depo. 107:23-112:1.

11      At some point, the officers began shouting "show me your

12  hands" to Decedent and Johnson.  Kenney Depo. 101:21-102:3;

13  Joseph Depo. 118:2-119:25. Johnson complied but Decedent did not.

14  Id.  Fearing for the safety of Kenney, Joseph then began firing

15  at Decedent.  Joseph Depo. 107:23-112:1. Fearing for his and

16  Joseph's safety, Kenney also began firing at Decedent.   Kenney

17  Depo. 98:15-99:7. Eventually Decedent complied and puts his hands

18  up, while Johnson still had his hands up and nearly sticking out

19  his window.  Kenney Depo. 107:17-108:14.

20      After radioing for backup, Kenney and Joseph observed

21  Decedent drop his hands down and start to bring them up in a

22  shooting position.  Kenney Depo. 113:25-119:12; Joseph Depo.

23  124:15-125:7, 135:21-137:19.  Kenney responded by firing 7 or 8

24  rounds at Decedent, and Joseph fired 4-6 shots at Decedent.  Id.

25      Decedent then complied again with the commands to raise his

26  hands.  Kenney 123:2-124:6.  However, shortly thereafter Decedent

27  dove down to the center console, to get what Kenney figured was a

28  gun.  Id.  Kenney responded to the "furtive reaction" by firing

1  his entire magazine, about 12-13 rounds.  <u>Id.</u>

2

3       B. <u>Plaintiffs' Version</u>

4       Upon pulling up to within 5 feet of the Thunderbird and

5  facing it at an angle, the police car shined its spotlight into

6  the Thunderbird.  Martin Depo. 135:17-136:8; Nagle Decl. Exhibit

7  S (filed under seal, Doc. #84-6).  The police car's doors "flew

8  open," the officers shouted "just put your, you know, hands,"

9  then the two officers began to open fire on the Thunderbird.

10  Johnson Depo. 140:10-24; Doc. #93-1, Facts 19-21.  In response to

11  the officers' demands, both Decedent and Johnson raised their

12  hands.  Johnson Depo. 140:25-141:16; Doc. #93-1, Facts 4-5.

13  After shots began, Decedent called out to the officers, "we got

14  our hands up, like, so stop shooting."  Johnson Depo. 140:10-

15  141:16. Johnson did not hear any further commands from the

16  officers.  <u>Id.</u>  Decedent never exited the vehicle during the

17  incident.  Doc. #93-1 #33; Johnson Depo. 144:6-13.

18       Decedent never had a gun during the incident.  Johnson Depo.

19  152:11-13; Doc. #93-1 #36.  Plaintiffs assert the only weapon

20  found in the car was a pellet gun with no fingerprints from

21  either Decedent or Johnson;  Defendants do not contend they found

22  a weapon with either Decedent or Johnson's fingerprints.  Kenney

23  testified that he never saw a weapon during or before the

24  shooting, only after the conclusion.  Kenney Depo. 215:4-10.

25  Joseph testified that he and Kenney did not have any verbal

26  communication with each other regarding a gun possessed by

27  Decedent during the incident.  Joseph Depo. 140:4-7.

28       At one point, Kenney reloaded his weapon and approached

1  closer to the car.  Doc. #93-1, Fact 24.  Kenney then climbed

2  onto the hood of the Thunderbird right in front of Johnson.

3  Johnson Depo. 144:22-145:18. He was standing on the hood and

4  began firing down into the car.  Id.

5      Johnson was hit by one of the bullets, which is still lodged

6  in his sacrum.  Johnson Depo. 61:1-8; Doc. #93-1, Fact 44.

7  Decedent died as the result of sustaining 30 gunshot wounds.

8  Nagle Decl. Exhibit BB (filed under seal, Doc. #84-11).  Decedent

9  had 3 gunshot wounds to the head, 5 to the neck, 6 to the torso,

10  6 to the right upper extremity, 9 to the left upper extremity,

11  and 1 to the left thigh.  Id.  Johnson submitted an answer to an

12  interrogatory stating he suffered and continues to suffer extreme

13  emotional distress caused by the Defendants as a result of this

14  incident.  Doc. #93-1, Fact 61; Nagle Decl. Exhibit AA.

15      After the initial shots were fired, Ahn Loc Harris went to

16  and was watching the incident from a window inside her residence.

17  She saw Johnson and Decedent inside the car with their hands up.

18  Ahn Loc Harris Depo. 99:11-103:18; Doc. #93-1 #1, 7.  She saw

19  Kenney shoot at least 6 shots into the window after climbing onto

20  the hood of the car.  Id.  Decedent collapsed onto Johnson,

21  taking his "last breath."  Id.  Kenney shot "probably about two

22  more times" after Decedent collapsed.  Id.

23      Ahn Khe Harris and Martin came to the window as well.  Ahn

24  Loc Harris Depo. 103:19-104:17. When Martin got to the window,

25  she saw Kenney standing in front of the Thunderbird reloading his

26  gun.  Martin Depo. 134:18-135:7. Martin started banging on the

27  window, but Kenney did not look at her as he climbed onto the

28  hood of the car and began shooting again.  Id.  Martin finally

1   got her window open and started yelling at Kenney.  Id.  Kenney

2   looked over at Martin and she said, "those are not - - you've got

3   the wrong people, those are not those type of people."  Id.

4   Kenney responded, saying "what the fuck you think I'm supposed to

5   do."  Id.  Kenney continued to shoot while he was talking and

6   looking at Martin.  Id.; Martin Depo. 145:15-146:5. Looking into

7   the car, Martin saw Johnson passed out and Decedent laid over

8   onto Johnson's lap.  Martin Depo. 143:4-16; Doc. #93-1 #37.

9   Martin saw Kenney shooting into the car, "trying to aim for

10  [Johnson's] head."  Id.

11      After the shooting stopped, the officers pulled Decedent out

12  of the car "threw him on the ground and handcuffed his hands

13  behind his back."  Martin 148:25-149:21.

14

15                          II.   OPINION

16      A.   Summary Judgment Standard

17      The Federal Rules of Civil Procedure provide that "a court

18  shall grant summary judgment if the movant shows there is no

19  genuine issue of material fact and that the movant is entitled to

20  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party

21  asserting that a fact cannot be disputed must support the

22  assertion by citing to particular parts in the record, or by

23  showing that the materials cited do not establish the presence of

24  a genuine dispute.  Fed. R. Civ. P. 56(c)(1)(A)-(B).  The purpose

25  of summary judgment "is to isolate and dispose of factually

26  unsupported claims or defenses."  Celotex Corp. v. Catrett, 477

27  U.S. 317, 323-24 (1986).

28      The moving party bears the initial responsibility of

                              7

1   informing the district court of the basis for its motion, and

2   identifying those portions of "the pleadings, depositions,

3   answers to interrogatories, and admissions on file, together with

4   the affidavits, if any," which it believes demonstrate the

5   absence of a genuine issue of material fact.  Celotex Corp., 477

6   U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  That burden may be

7   met by "'showing'- that is, pointing out to the district court-

8   that there is an absence of evidence to support the non moving

9   party's case."  Fairbank v. Wunderman Cato Johnson, 212 F.3d 528,

10  531 (9th Cir. 2000) (quoting Celotex Corp., 477 U.S. at 325).  If

11  the moving party meets its burden with a properly supported

12  motion, the burden shifts to the opposing party.  Id.  The

13  opposition "may not rest upon the mere allegations or denials of

14  the adverse party's pleading," but must provide affidavits or

15  other sources of evidence that "set forth specific facts showing

16  that there is a genuine issue for trial."  Devereaux v. Abbey,

17  263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P.

18  56(e)).

19      The adverse party must show that the fact in contention is

20  material and the issue is genuine.  Anderson v. Liberty Lobby,

21  Inc., 477 U.S. 242, 248 (1986).  A "material" fact is a fact that

22  might affect the outcome of the suit under governing law.  Id.  A

23  fact issue is "genuine" when the evidence is such that a

24  reasonable jury could return a verdict for the non-moving party.

25  Villiarmo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th

26  Cir. 2002).  However, uncorroborated and self-serving testimony

27  alone does not create a genuine issue of fact.  Id.  The Court

28  must view the facts and draw inferences in the manner most

8

1  favorable to the non-moving party.  Matsushita Elec. Indus. Co.
2  v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

3       The mere existence of a scintilla of evidence in support of
4  the non-moving party's position is insufficient: "There must be
5  evidence on which the jury could reasonably find for [the non-
6  moving party]."  Anderson, 477 U.S. at 252.  This Court thus
7  applies to either a defendant's or plaintiff's motion for summary
8  judgment the same standard as for a motion for directed verdict,
9  which is "whether the evidence presents a sufficient disagreement
10  to require submission to a jury or whether it is so one-sided
11  that one party must prevail as a matter of law."  Id.

12       B.   Claims

13       Defendants filed the Monell MSJ addressing the Monell claims
14  brought by Johnson and Mitchell and found in the 4th cause of
15  action in their complaint.  Defendants seek summary judgment or
16  in the alternative partial summary judgment of those claims based
17  on Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S.
18  658 (1978).

19            1.   Monell Standard

20       To create municipal liability under § 1983, the
21  constitutional violation must be caused by "a policy, practice,
22  or custom of the entity," Dougherty v. City of Covina, 654 F.3d
23  892, 900 (9th Cir. 2011), or be the result of an order by a
24  policy-making officer, see Gibson v. County of Washoe, 290 F.3d
25  1175, 1186 (9th Cir. 2002).  See also Tsao v. Desert Palace,
26  Inc., 698 F.3d 1128, 1139 (9th Cir. 2012).  The Ninth Circuit has
27  discussed the proper basis for Monell claims:

28       In Monell, the Supreme Court held that municipalities

may be held liable as "persons" under 42 U.S.C. § 1983, but cautioned that a municipality may not be held liable for the unconstitutional acts of its employees solely on a respondeat superior theory.  436 U.S. at 691.  Rather, the Supreme Court has "required a plaintiff seeking to impose liability to a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997) (citing Monell, 436 U.S. at 694; Pembaur v. Cincinnati, 475 U.S. 469, 480-81 (1986); City of Canton v. Harris, 489 U.S. 378, 389 (1989)).  In justifying the imposition of liability for a municipal custom, the Supreme Court has noted that "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Id. at 404 (citing Monell, 436 U.S. at 690-91).

Hunter v. Cnty. of Sacramento, 652 F.3d 1225, 1232-33 (9th Cir. 2011).

    "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) holding modified by Navarro v. Block, 250 F.3d 729 (9th Cir. 2001). However, the Ninth Circuit has "long recognized that a custom or practice can be 'inferred from widespread practices or "evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded."'" Hunter, 652 F.3d at 1233-34 (quoting Nadell v. Las Vegas Metro. Police Dep't, 268 F.3d 924, 929 (9th Cir. 2001)).  "[E]vidence of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can

10

1    support an inference that an unconstitutional custom or practice

2    has been unofficially adopted by a municipality." <u>Hunter</u>, at

3    1234 n.8 (emphasis in original).

4        More relevant here, courts have found that "in some

5    circumstances a *policy* of inaction, such as a policy of failing

6    to properly train employees, may form the basis for municipal

7    liability." <u>Id.</u> "[A] local government's decision not to train

8    certain employees about their legal duty to avoid violating

9    citizens' rights may rise to the level of an official government

10    policy for purposes of § 1983." <u>Connick v. Thompson</u>, 131 S. Ct.

11    1350, 1359 (2011).  However, to satisfy § 1983 for a failure to

12    train claim, "a municipality's failure to train its employees in

13    a relevant respect must amount to 'deliberate indifference to the

14    rights of persons with whom the [untrained employees] come into

15    contact.'  Only then 'can such a shortcoming be properly thought

16    of as a city "policy or custom" that is actionable under

17    § 1983.'" <u>Id.</u> (quoting <u>Canton</u>, 489 U.S. at 388).  The deliberate

18    indifference standard has been discussed thoroughly by the

19    Supreme Court:

20        "'[D]eliberate indifference' is a stringent standard of
            fault, requiring proof that a municipal actor
21        disregarded a known or obvious consequence of his
            action."  Thus, when city policymakers are on actual or
22        constructive notice that a particular omission in their
            training program causes city employees to violate
23        citizens' constitutional rights, the city may be deemed
            deliberately indifferent if the policymakers choose to
24        retain that program.  The city's "policy of inaction"
            in light of notice that its program will cause
25        constitutional violations "is the functional equivalent
            of a decision by the city itself to violate the
26        Constitution."

27        . . . [¶]

28    A pattern of similar constitutional violations by

untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

Connick, 131 S. Ct. at 1360 (internal citations omitted) (citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 410 (1997); Canton, 489 U.S. at 395.).

In their fourth cause of action, Plaintiffs have also stated claims against Kreins in his individual and official capacities. First, since the City is named as a defendant on this cause of action, naming Kreins in his official capacity is redundant. The Court hereby dismisses the claims brought against him in his official capacity. However, a supervisory official can be found liable in his individual capacity if there is a sufficient nexus between his own conduct and the constitutional violations committed by subordinates. The Ninth Circuit has addressed the contours of the supervisory liability doctrine:

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." Preschooler II v. Clark County Sch. Bd. of Trustees, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005)). In a section 1983 claim, "a supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them.'" Preschooler II, 479 F.3d at

1182 (quoting <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989)).  "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms."  <u>Id.</u> at 1183 (quoting <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978)).

<u>Corales v. Bennett</u>, 567 F.3d 554, 570 (9th Cir. 2009); <u>see also</u>

<u>Mackinney v. Nielsen</u>, 69 F.3d 1002, 1008 (9th Cir. 1995) ("Under

§ 1983, a supervisor may be liable if there exists either '(1)

his or her personal involvement in the constitutional deprivation

*or* (2) a sufficient causal connection between the supervisor's

wrongful conduct and the constitutional violation.'") (internal

citation omitted).

   2. <u>Analysis</u>

  Defendants first argue that statistics reflecting the number

of shootings by police during the relevant time period cannot

support a finding the City had a policy or practice that violated

citizens' rights without a finding that the shootings were

improper.  <u>Monell</u> MSJ at pp. 9-14.  Defendants are referencing

data relied on by Plaintiffs that between May 25 and October 21

of 2012 there were over 10 shootings involving the VPD, resulting

in 6 civilian deaths.  In addition, there were 3 shootings by

police in 2013.  All of these came after many years of few to no

shootings by police.  Defendants contend the inference drawn by

Plaintiffs' expert, Franklin Zimring, and put forth by

Plaintiffs, is not reasonable.  <u>Monell</u> MSJ at p. 11.  Defendants

argue: "Without a connection between the statistics and a

violation of law, the mere happening of civilian fatalities

cannot prove the existence of a policy or custom to exercise

unlawful force.  <u>Id.</u>

1    In their motion, Defendants rely extensively on _Strauss v._

2  _City of Chicago_, 760 F.2d 765, 768-69 (7th Cir. 1985).  In

3  _Strauss_, the Seventh Circuit addressed statistical information

4  offered by the plaintiff to support a _Monell_ claim at the motion

5  to dismiss stage.  760 F.2d at 768-69.  The plaintiff offered

6  "statistical summaries from the Office of Professional Standards

7  regarding complaints filed with the police department," the

8  Chicago Police Department.  _Id._  The summaries indicated that the

9  police department sustained only 6-7% of all registered

10  complaints for a three-year period from 1977-1979.  _Id._  The

11  plaintiff argued this low percentage "'must give rise to a

12  reasonble [sic.] man's suspicions that defendant Chicago's

13  methods of review are weighted to discourage positive findings."

14  _Id._  The court found the plaintiff's reasoning "specious," and

15  concluded:

16      the number of complaints filed, without more, indicates
        nothing.  People may file a complaint for many reasons,
17      or for no reason at all.  That they filed complaints
        does not indicate that the policies that [the
18      plaintiff] alleges exist do in fact exist and did
        contribute to his injury.  [¶]  At the very least [the
19      plaintiff] "would need to identify as well what it was
        that made those prior arrests * * * illegal and to show
20      that a similar illegality was involved in his case."

21  _Id._ (quoting _Ekergren v. City of Chicago_, 538 F. Supp. 770, 773

22  (N.D. Ill. 1982)).

23      Defendants next argue that even if the Court considers the

24  "bare statistics regarding officer shootings or the ethnicity of

25  those shot, as a matter of law, Plaintiffs cannot show the

26  existence of a custom or practice in existence for a sufficient

27  duration to constitute evidence of a municipal policy."  _Monell_

28  MSJ at pp. 13-14.  They argue this spike in shootings was an

14

1  "anomaly, not a pattern" and could not constitute "evidence of

2  repeated constitutional violations." Defendants point to the

3  evidence that the internal investigations and reviews of these

4  shootings did not find the conduct surrounding the shootings

5  improper and that an investigation by the local district

6  attorney's office found no evidence of actionable conduct.  Id.

7       Defendants next attack Plaintiffs' claim on the basis of

8  inadequate training, arguing Plaintiffs do not have sufficient

9  evidence to support such a claim.  They argue that even if the

10 conclusions drawn by Plaintiffs from the document, entitled

11 "2013: The Year in Review," is assumed to be true, it does not

12 support Plaintiffs' claims.  The report indicates that VPD

13 members had not had internal training in the three years prior to

14 the report.  Defendants argue that even with no internal

15 training, there is no evidence this was "inadequate 'in relation

16 to the tasks the particular officer must perform.'"  Monell MSJ

17 at pp. 14-15.  They also specifically contend that evidence of

18 Kenney's involvement in three of the shootings in 2012 has no

19 nexus with a failure to train, let alone a nexus to wrongdoing.

20      This argument is persuasive in light of Plaintiffs'

21 inability to affirmatively show each of these shootings

22 constituted excessive force or a constitutional violation of some

23 sort.  Defendants' reliance on their own investigations as well

24 as the United States Department of Justice's determination that

25 the officers' conduct was not appropriate for criminal

26 prosecution as proof of propriety carries little weight, since

27 clearly a different standard applies in these contexts.

28      The arguments put forth by Plaintiffs, both in their

1    opposition and at the hearing, focus primarily on establishing

2    <u>Monell</u> liability based on a "failure to train" theory.

3    Plaintiffs' strongest argument is that a pattern of VPD officer's

4    resorting to lethal force began to form in Vallejo in the period

5    immediately before the incident underlying this action.

6    Plaintiffs argue that Kreins and the City should have detected

7    the pattern of "shoot first, non-emergency police encounters"

8    resulting in constitutional violations and deaths and that in

9    response, they should have taken some action to avoid such

10    conduct in the future.  They argue the lack of discipline of the

11    officers and the lack of even small changes to the admittedly

12    inadequate training in response to these incidents supports their

13    <u>Monell</u> claim.

14         In order for Plaintiffs' claims to go forward, the Court

15    would need to conclude that Kreins and the City's response, or

16    lack thereof, tends to support they were *deliberately indifferent*

17    to the harm being caused and the risk that, without training or

18    adequate supervision, constitutional violations *would* occur in

19    the future.  Defendants' main argument in response is that there

20    is no proof that any constitutional violations actually occurred

21    in the other shootings or events invoking complaints to the VPD.

22    It is clear that allowing a failure to train claim to go to the

23    jury based upon a single unconstitutional incident is improper.

24    <u>See</u> <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 399-400 (1989).

25         The evidence shows that Kreins had the authority and

26    responsibility to make policy changes and institute trainings

27    within the VPD.  Def. Resp. to Pl. SUF (Doc. #91-1) Facts 1-3.

28    Kreins testified that he reviewed general orders, policies and

procedures, staffing issues and the organization itself within
the VPD after becoming police chief in July 2012, but that he
took no action on this information from July 2012 to the date of
the shooting underlying the claims in this case.  Id. Fact 5.
Kreins also testified that when he entered the VPD as chief his
view was that there were "some inadequacies with the training
that was being given to the officers at that time."  Kreins Depo.
213:12-216:13. This was the result, at least in part, of a
reduction in training over the four previous years.  SUF Fact 9.
The period of time during this reduction in training saw a string
of four shootings by police within a three-month period.

Kreins indicates that one training program, the "force-
options simulator," would have been useful to Kenney and Joseph
when approaching the Thunderbird that night.  Kreins Depo.
213:12-216:13. The simulator presents scenarios to officers where
they are then required to decide whether to use verbal commands,
less lethal weapons, or lethal force.  Id.  It was not
implemented in VPD until 2013.  Id.  In addition, Plaintiffs'
expert, Zimring, discussed a laundry list of types of
preventative actions that a police chief wishing to reduce
"shoot-first policing" could take.  Zimring Declaration at pp.
21-22; SUF Fact 34.  Kreins testified that he reviewed all the
critical incident reports from 2012 for the VPD.  SUF Fact 7;
Monell Opp. at p. 8.  As a result of that review, Kreins did not
make any changes to any type of training at the VPD in response
to this information because there was no evidence of
constitutional violations.  Id.

Kreins also testified that he necessarily relied on

statistics in his position in order to identify trends and to analyze the conduct of officers under his command.  Kreins Depo. 216:25-218:24. Kreins stated that he analyzed the VPD statistics and had an awareness of the relative statistics nationwide of officer-involved homicides.  Id.  The end result of his analysis was that he could not make "a conclusion based upon some generalities in numbers." Id. He testified that he was "unable to tell" whether there was a higher level of police shootings in Vallejo than the national average, but did not take steps to find out more or to improve upon the statistical analysis.  Id. Zimring opined that the rate of police killings in Vallejo for 2012-2013 compared to the population generated a risk of death at the hands of police well above that in larger cities such as New York and in the country as a whole.  The VPD did not have a policy of looking back at an officer's previous complaints of excessive force or other critical incidents they were involved in when evaluating a specific critical incident.  Kreins Depo. 161:7-164:23.

Kreins was also asked at his deposition about a number of incidents involving Kenney.  Kreins Depo. 218:25-226:20. Kreins testified that when he met with his officers upon becoming chief, he did not analyze all their case files.  Specifically, Kreins admits that he did not even discuss the incidents found in Kenney's file when he sat down with him.  Id. This includes the killing of Anton Barrett, the Cooley excessive force complaint, and a complaint from a minor's father, all involving allegations of misconduct on Kenney's part.  Id. Kreins believed that VPD did not need to look at an officer's previous complaints of

excessive force because he believed they had a strong
understanding of a pattern for a particular officer and he was
not aware of any trend involving excessive force.  Id.; SUF (Doc.
#91-1) Fact 11.

As regards discipline, Kreins testified that his personal
interviews of Kenney and Joseph provided enough information on
their own to return both of them to duty.  SUF, Fact 12.  In
addition, VPD officers are referred to a marriage and family
therapist instead of a licensed psychiatrist.  SUF Facts 17-21.

After a careful review of the above described extensive
record in this case and relevant case law, the Court concludes
that although there is evidence of some systemic issues within
the VPD, the evidence does not meet the extremely stringent legal
standards required for claims under Monell.

Although VPD officers shot and killed four people in the
span of just three months in the middle of 2012 and Defendants
deduced no pattern and made no changes in training in response,
there is insufficient evidence that any of the other shootings by
police resulted in constitutional violations.  In order for a
claim to succeed, Defendants must have been on "actual or
constructive notice that a particular omission in their training
program causes city employees to violate citizens' constitutional
rights."  Connick, 131 S. Ct. at 1360 (internal citations
omitted).  As stated, "[a] pattern of similar constitutional
violations by untrained employees is 'ordinarily necessary' to
demonstrate deliberate indifference for purposes of failure to
train."  Id.  In the instant case there is no evidence that VPD
officers committed other constitutional violations.

19

1    Plaintiffs argue that a reasonable jury could find that the
2    total inaction of the City and Kreins in response to this uptick
3    of police-involved shootings of civilians, and specifically the
4    repeated incidents involving Kenney, showed a "deliberate
5    indifference" to the constitutional rights of the people of
6    Vallejo.  See Hunter, 652 F.3d at 1232-33, 1234 n.8; Connick, 131
7    S. Ct. at 1359.  However, again, the unconstitutionality of these
8    actions has not been proven.  The Court does note the difficult
9    task facing Plaintiffs who wish to bring a claim for failure to
10   train.  As is evident by this case, the constitutionality of
11   police conduct is often not determined by an unbiased entity
12   until years after the conduct has occurred. Nevertheless, some
13   evidence of constitutional violations is required to maintain the
14   Monell claim in this case.

15   The Court also finds insufficient evidence to create a
16   genuine issue of material fact as to whether "a sufficient causal
17   connection between [Kreins'] alleged wrongful conduct and the
18   constitutional violation[s]" exists.  Mackinney v. Nielsen, 69
19   F.3d at 1008.  Although the evidence shows that Kreins' inaction
20   may have been called into question in the face of repeated use of
21   lethal force by his officers against victims who either did not
22   have firearms or who at least did not fire them, there is a lack
23   of evidence that this resulted in constitutional violations.
24   Therefore, the Court also grants Defendants' motion as to the
25   claim against Kreins in his individual capacity for supervisory
26   liability.

27

28

1                                   III.   ORDER

2      For the reasons set forth above, the Court GRANTS

3 Defendants' motion for summary judgment on Plaintiffs Joseph

4 Johnson and Cynthia Mitchell's Monell claim set forth in the

5 fourth cause of action of their Complaint

6      IT IS SO ORDERED.

7 Dated: April 14, 2015

8

9                                    JOHN A. MENDEZ,
                                   UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28